UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
HARRISONBURG DIVISION

| | | |
|---|---|---|
| JOYCE FLORES, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 5:20-cv-00087 |
| | ) | |
| v. | ) | **MEMORANDUM OPINION** |
| | ) | |
| VIRGINIA DEPARTMENT OF CORRECTIONS, | ) | By:   Hon. Thomas T. Cullen |
| | ) | United States District Judge |
| | ) | |
| Defendant. | ) | |

Plaintiff Joyce Flores worked as a dental hygienist at a Virginia correctional facility. Flores alleges that when she arrived at the facility after her lengthy commute on July 17, 2019, she had a fully saturated tampon in her vagina but nevertheless passed through the security body scanner without incident. Later that morning, after Flores had removed the tampon and placed toilet paper in her underwear as a temporary measure, a security officer asked her to go through the body scanner again. Unsurprisingly, the first and second images looked different. After being confronted about this discrepancy, Flores explained that she was on her period, showed a female correctional officer evidence that she was in fact menstruating, inserted another tampon, and went through the body scanners a third time. Despite explaining why the second image (sans tampon) looked different from the first and third images (with tampons), and after K9 searches allegedly did not locate any contraband, Defendant Virginia Department of Corrections ("VDOC") placed Flores on administrative leave and ultimately

fired her approximately two weeks later. VDOC's purported reason for Flores's termination was "suspicion of contraband."

Flores filed this suit against VDOC bringing one claim for unlawful discrimination under Title VII of the Civil Rights Act, as amended by the Pregnancy Discrimination Act ("PDA"). VDOC filed the instant motion to dismiss under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), seeking dismissal of the complaint in its entirety with prejudice. After the parties fully briefed the motion, the court heard argument on February 16, 2021. Because Flores has plausibly alleged that VDOC violated Title VII, but she failed to bring a proper disparate-impact claim, the court will grant in part and deny in part VDOC's motion to dismiss.

## I.      FACTUAL BACKGROUND

Flores's complaint alleges the following facts. In September 2018, VDOC issued a policy prohibiting women from using tampons or menstrual cups while visiting offenders incarcerated in VDOC facilities. (Compl. ¶¶ 8–9 [ECF No. 1].) At that time, the VDOC's cited concern was that tampons and menstrual cups may "appear" as possible contraband in a body scan. (*Id.* ¶ 9.) The policy garnered public criticism. (*Id.* ¶ 10.) Approximately one week later, the VDOC suspended the "ban on tampon use by visitors to VDOC prisons." (*Id.* ¶ 11.) In early 2019, however, Flores alleges that "it was made public that VDOC was still treating visitors that were wearing tampons or menstrual cups differently than other visitors to the prisons." (*Id.* ¶ 12.) In support of this assertion, Flores points to the testimony of VDOC's Corrections Operations Administrator, Margie Vargo, who expressed to the Virginia General Assembly that VDOC facilities could not tell via body scans whether objects inserted into

women's vaginas were drugs or tampons. (*Id.* ¶ 12.) The VDOC did not bar its employees

from wearing tampons or menstrual cups to work at VDOC facilities. (*Id.* ¶ 13.) Flores alleges,

however, that the same "issue"—the inability to discern whether a female has contraband or

a tampon inserted into her vagina—applies to employees as well as visitors because employees

are required to pass through the same security technology at VDOC facilities. (*Id.*)

In March 2019, Flores started working as a Registered Dental Hygienist at VDOC's

Augusta Correctional Center ("ACC"). (*Id.* ¶ 14.) Although Flores was hired through a staffing

company, she was subject to VDOC rules and employment policies. (*Id.* ¶ 15.) Flores alleges

that VDOC was therefore a "joint employer" under Title VII. (*Id.*)

On July 17, 2019, Flores had a heavy menstrual flow and was using a "super absorbent

tampon." (*Id.* ¶ 17.) After her two-hour commute, her tampon was fully saturated when she

arrived at ACC. (*Id.* ¶¶ 17–18.) Flores went through the "normal security protocol, . . . with

the expanded, saturated tampon in her vagina, including passing through the body scanner,

without incident." (*Id.* ¶ 18.) After clearing security, Flores proceeded to her dental office and

prepared for her workday. (*Id.* ¶ 19.) She also went to the restroom and replaced her tampon.

(*Id.*) When Flores went to use the restroom again later that morning, she realized that she

needed to change her tampon for a second time, but she had not brought a new one into the

restroom with her. (*Id.*) Because Flores had a dental patient waiting for her, she removed the

tampon and replaced it with tissue paper in her underwear. (*Id.*)

Approximately two hours after Flores started working, a VDOC employee, Sergeant

Benjamin Lokey, came into Flores's office and asked that she accompany him to the security

checkpoint at the entrance of the facility. (*Id.* ¶ 20.) Sgt. Lokey instructed Flores to go through

the body scanner, and she did. (*Id.* ¶ 21.) Sgt. Lokey then took Flores to a separate room where they were joined by a female VDOC security investigative officer. (*Id.* ¶ 22.) Sgt. Lokey "began to interrogate" Flores and advised her "that he believed her body[-]scan image from her arrival in the morning (2 hours earlier) contained a suspicious item in her vagina that was not present on the body[-]scan image taken moments earlier." (*Id.*) Flores explained that she had entered ACC with a saturated tampon following her commute but did not have a tampon in her vagina during the second scan because she had removed it in the restroom shortly prior. (*Id.* ¶ 23.) Flores offered to go into the restroom with the female VDOC security officer to demonstrate that she was menstruating. (*Id.*) Two female officers then went with Flores into the restroom and one officer accompanied her into the stall. (*Id.* ¶ 24.) Flores confirmed that she did not have a tampon in her vagina but showed the officer the tissue with menstrual blood on it. (*Id.*) Flores then offered to insert a new (third) tampon and go through the body scanner again. (*Id.* ¶ 25.) The officers agreed, and Flores went through the body scanner for a third time. (*Id.*)

But VDOC officials remained unsatisfied. After the third scan, Sgt. Lokey required Flores to return to the separate room where he "continued to interrogate [Flores] under suspicion of bringing contraband [in]to the facility." (*Id.* ¶ 26.) Flores "continued to vehemently deny [the accusations] and again explain[ed] that she had a tampon in when she arrived and further explained (again) why she did not have one in for the second scan." (*Id.*) The VDOC officers then brought Flores to Warden John Woodson's office, where he interrogated Flores. (*Id.* ¶ 27.) Flores provided her explanation, and she was shown the three body-scan images: "the first clearly showed the saturated tampon, the second when [Flores] had no tampon, and the third with [a] new tampon." (*Id.*) Flores "urged the Warden and

VDOC to contact the body[-]scanner manufacturer so that they could get a better understanding of what they were seeing." (*Id.*) At the conclusion of the meeting, the Warden placed Flores on paid administrative leave for "suspicion of contraband." (*Id.* ¶ 28.)

VDOC security officers then brought Flores back into the separate room where she waited. (*Id.* ¶ 29.) She later learned that VDOC conducted a K9 search of the entire medical unit and dental area. (*Id.*) VDOC also requested Flores's permission to conduct a K9 search of her car in the parking lot; she consented to that search. (*Id.* ¶ 30.) VDOC did not find any contraband in either location. (*Id.*) After the K9 searches, Sgt. Lokey gave Flores a box containing her personal items, which had been searched through, and told Flores "to go home and wait for Warden Woodson to call her." (*Id.* ¶ 31.)

Approximately three days later, Warden Woodson called Flores and told her that he had checked with his supervisor, but he needed more time to make a decision about her termination. (*Id.* ¶ 32.) Flores alleges that she "again pleaded with him to seek subject[-]matter expertise and/or manufacturer input on VDOC's knowingly erroneous read of the body[-]scan images." (*Id.*) On July 31, 2019, when she had not heard anything further, Flores called Warden Woodson and requested to return to work. (*Id.* ¶ 33.) Warden Woodson responded that he was "leaning toward termination." (*Id.*) Flores asked him again if he had checked with the manufacturer or a subject-matter expert regarding the body-scan images. (*Id.*) Warden Woodson allegedly raised his voice and told Flores that he had "checked with [his] supervisor." (*Id.*) Warden Woodson then informed Flores that VDOC was terminating her employment due to "suspicion of contraband." (*Id.*) Flores alleges that she never brought, or attempted to bring, any contraband into ACC, and that the reason for her termination was pretext for sex

discrimination. (*Id.* ¶ 34.) Flores further alleges that her employment "was terminated because she was a menstruating female utilizing a feminine hygiene product when she arrived to work on July 17, 2019." (*Id.*)

## II.   MOTION TO DISMISS STANDARD

Motions to dismiss under Rule 12(b)(6) test the legal sufficiency of a complaint. *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999). To survive a Rule 12(b)(6) motion, the complaint "must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 547 (2007)). A claim is facially plausible when the plaintiff's allegations "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* While a complaint does not need "detailed factual allegations," complaints merely offering "labels and conclusions," "naked assertion[s] devoid of 'further factual enhancement,'" or "a formulaic recitation of the elements of a cause of action will not do." *Id.* (alteration in original) (internal quotation marks omitted) (quoting *Twombly*, 550 U.S. at 555, 557.)

## III.   ANALYSIS

VDOC raises several arguments: (1) that the PDA does not apply; (2) that Flores's gender-discrimination claim fails because she has not alleged facts indicating that gender was a motivating factor in her termination; (3) that Flores has not stated a viable "pattern and practice" or "disparate impact" claim under Title VII; and (4) that Flores's demand for punitive damages is improper. The court will address each argument in turn.

A.      **Title VII**

1.      **Application of the Pregnancy Discrimination Act**

VDOC argues that the PDA does not apply to menstruation, and therefore Flores's claim must fail as a matter of law. Stated differently, VDOC argues that because menstruation is not "pregnancy, childbirth, or a related medical condition," 42 U.S.C. § 2000e(k), allowing Flores's claim to proceed would expand the PDA beyond its intended application. Flores argues that perimenopausal menstruation, as a condition which only affects those with female reproductive organs,[1] is a related medical condition to pregnancy. In other words, as the argument goes, because menstruation signals the body's hormonal response in the absence of pregnancy, it must be "related" to pregnancy.

Title VII makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges or employment, because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1). In 1976, the Supreme Court held that an employer's disability-benefits plan, which excluded pregnancy-related disabilities, did not violate Title VII as long as the employer provided the same benefits to men and women. *Gen. Elec. Co. v. Gilbert*, 429 U.S. 125, 145 (1976), *superseded by statute as recognized by Newport News Shipbuilding & Dry Dock Co. v. EEOC*, 462 U.S. 669, 678 (1983). In 1987, shortly after the Supreme Court's decision in *Gilbert*, Congress passed the PDA, which amended Title VII to include the following definition: "The terms 'because of sex' or 'on the basis of sex' include, but are not

---

[1] The court understands that transgender men (individuals who were assigned female at birth and transitioned to living as men) and nonbinary individuals may also menstruate. Because Flores is a female, however, the court will refer to "female reproductive organs," "female physiology," "unique female attributes," and other like expressions throughout this opinion.

limited to, because of or on the basis of pregnancy, childbirth, or related medical conditions." 42 U.S.C. § 2000e(k). The PDA mandates that "women affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes." *Id.* "The PDA created no new rights or remedies, but [it] clarified the scope of Title VII by recognizing certain inherently gender-specific characteristics that may not form the basis for disparate treatment of employees." *Hall v. Nalco Co.*, 534 F.3d 644, 647 (7th Cir. 2008). The Supreme Court later recognized that by amending Title VII, Congress "unambiguously expressed its disapproval of both the holding and the reasoning of the Court in the *Gilbert* decision." *Newport News Shipbuilding*, 462 U.S. at 678.

After Congress enacted the PDA, "courts have since interpreted Title VII to cover a far wider range of employment decisions entailing female physiology." *EEOC v. Hous. Funding II, Ltd.*, 717 F.3d 425, 428 (5th Cir. 2013) (lactation is a related medical condition under the PDA); *see also Harper v. Thiokol Chem. Corp.*, 619 F.2d 489, 491–92 (5th Cir. 1980) (policy requiring women who were on pregnancy leave to have a normal menstrual cycle before returning to work violated Title VII); *Hall*, 534 F.3d at 648–49 (plaintiff's termination after seeking leaves of absence for infertility treatments violated Title VII); *Ducharme v. Crescent City Déjà Vu, L.L.C.*, 406 F. Supp. 3d 548, 556 (E.D. La. 2019) (abortion is a related medical condition to pregnancy under the PDA). While the Fifth Circuit in *Harper* and *Houston Funding II* discussed menstruation in the context of the PDA, that court never explicitly held that menstruation was a "related medical condition" to pregnancy. *See Hous. Funding II*, 717 F.3d at 429 (noting that in *Harper*, the Fifth Circuit "did, at least implicitly, hold that menstruation was 'pregnancy, childbirth, or [a] related medical condition,' given the facts of that case." (alteration

in original)). Neither Flores nor this court can identify any other cases explicitly holding that menstruation is a "related medical condition" to pregnancy or childbirth under the PDA. On the other hand, VDOC identifies two nonbinding district court decisions holding that the PDA does not apply to menstruation (or at least, to the side effects or symptoms of menstruation). *See Jirak v. Fed. Express Corp.*, 805 F. Supp. 193, 194 (S.D.N.Y. 1992) (holding that "menstrual cramps are not a medical condition related to pregnancy or childbirth"); *Coleman v. Bobby Dodd Inst., Inc.*, No. 4:17-CV-29, 2017 WL 2486080, at *1 (M.D. Ga. June 8, 2017) (finding that an employer's termination of a female employee for soiling company property due to excessive menstrual bleeding did not violate Title VII).

As a general matter, there is a strong argument that menstruation is a "related medical condition" to pregnancy and childbirth under the PDA. Menstruation is inarguably an integral part of the female reproductive cycle; menstruation is necessary for a woman to possess the ability to become pregnant; and menstrual disorders—including amenorrhea,[2] uterine fibroids,[3] endometriosis,[4] and polycystic ovary syndrome[5]—can affect a woman's capability to become pregnant. But this is a legal question that the court need not reach today. As

---

[2] "Any form of amenorrhea (absence or cessation of menstruation) which occurs after menstruation had been established at puberty, and before the menopause (change of life)." *Amenorrhea, secondary*, *Attorney's Dictionary of Medicine* (2020).

[3] "A noncancerous tumor that develops in the muscular uterine wall." *Uterine fibroid*, *Attorney's Dictionary of Medicine* (2020).

[4] "Endometriosis is a condition in which pieces of endometrium (lining of uterus) are located in abnormal places, as in the ovary. It is a common cause of infertility in women." *Endometriosis and infertility*, *Attorney's Dictionary of Medicine* (2020).

[5] "A condition marked by the presence of multiple cysts in the ovaries. The ovaries are usually twice the normal size. Clinically, the condition is characterized by persistent anovulation (no ovulation), hirsutism (excessive growth of hair), menstrual abnormalities, infertility (due to anovulation), and excessive production of androgens (male sex hormones)." *Polycystic ovary syndrome*, *Attorney's Dictionary of Medicine* (2020).

discussed in detail below, the court finds that Flores has stated a viable Title VII claim regardless of applying an expanded definition of "because of sex" or "on the basis of sex" under the PDA. Indeed, during oral argument, Flores's counsel argued that her Title VII claim could proceed regardless of the PDA. The court agrees, and therefore declines to issue an unnecessary ruling for purposes of this motion to dismiss. *Cf. Butcher v. Commonwealth*, 298 S.E.2d 538, 540 (Va. 2020) ("[T]he doctrine of judicial restraint dictates that we decide cases on the best and narrowest grounds available." (internal quotation marks and citation omitted)).

### 2.    Remaining Title VII Claims

"Title VII prohibits both 'overt discrimination,' known as 'disparate[-]treatment discrimination,' and 'practices that are fair in form, but discriminatory in operation,' known as 'disparate[-]impact discrimination." *Medeiros v. Wal-Mart, Inc.*, 434 F. Supp. 3d 395, 411 (W.D. Va. 2020) (citation omitted). Flores brings disparate-treatment and disparate-impact claims.

### i.    Disparate Treatment

There are two ways to establish liability under Title VII for a disparate-treatment claim: (1) "demonstrating through direct or circumstantial evidence that [gender] was a motivating factor in the employer's adverse employment action"; or (2) using the burden-shifting scheme in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Swaso v. Onslow Cnty. Bd. of Educ.*, 698 F. App'x 745, 747 (4th Cir. 2017) (internal quotation marks omitted).

As an initial matter, VDOC argues that "Flores does not allege any direct evidence that her gender was a motivating factor in her termination," and that Flores must proceed under *McDonnell Douglas*. (ECF No. 5 at 8.) Indeed, the crux of VDOC's argument under *McDonnell Douglas* is that Flores has not stated a valid "comparator" claim. Namely, VDOC argues that

Flores did not allege facts showing that "any male, or even a non-menstruating female, has entered a VDOC correctional facility showing an anomaly in a body cavity who was then treated more favorably than she." (ECF No. 5 at 9.) At oral argument, Flores's counsel clarified that she was not trying to bring a "comparator" claim, because the fact that menstruation is inapplicable to men demonstrates that Flores was in fact treated differently because of an inherently female characteristic.[6] While the court agrees that Flores has not alleged "direct" evidence of discriminatory intent (*e.g.*, VDOC employees never directly stated that she was discharged because of her sex, or because she was menstruating or using a tampon), as discussed more fully below, Flores has sufficiently alleged circumstantial evidence of sex discrimination. As such, the court finds that Flores does not need to proceed under the burden-shifting scheme in *McDonnell Douglas.*

Next, VDOC argues that her complaint is devoid of allegations revealing that gender was a motivating factor in her termination; rather, VDOC asserts that she was terminated for "suspicion of contraband" which had nothing to do with Flores being female, using a tampon, or menstruating. Finally, VDOC argues that Flores "asks this Court to ignore the reasonable inference from VDOC's investigation, use of K9 searches, and its stated reason for her termination that she was, in fact, suspected of possessing contraband."[7] (ECF No. 5 at 10.)

---

[6] The court notes that comparing menstruating females to men and non-menstruating females in this context is an awkward fit; reality and common sense demonstrate that most males and non-menstruating females typically do not have any *legitimate* reason to have any objects in their body cavities prior to entering a prison facility. The best comparison that courts have discussed is fecal incontinence, as it can affect men and women alike, and individuals can insert anal plugs into their rectums. But fecal incontinence is a medical condition that is treatable and hopefully short-lived for those that suffer from it. Menstruation, on the other hand, is a normal physiological cycle that women, in their reproductive years, experience approximately one quarter of the time.

[7] At oral argument, VDOC also argued that the court should not give any reasonable inferences to Flores's complaint because it is inherently implausible. Namely, VDOC suggests that because Flores was not profusely bleeding after she took out her second tampon and replaced it temporarily with toilet paper, that the events

First, the court has no obligation to give any reasonable inferences to VDOC; rather, the law requires the opposite. *See In re MicroStrategy, Inc. Sec. Litig.*, 115 F. Supp. 2d 620, 627 (E.D. Va. 2000) ("In considering a motion to dismiss a complaint [under Rule 12(b)(6)], a court must construe the complaint in the light most favorable *to the plaintiffs*, read the complaint as a whole, and take the facts asserted therein as true." (emphasis added) (citation omitted)). The court must take as true Flores's allegations that VDOC conducted multiple K9 searches and that those searches did not produce any contraband. It is also not in dispute for purposes of this motion that VDOC purportedly terminated Flores for "suspicion of contraband," as Flores states so in her complaint. (Compl. ¶ 33.) Rather, the question is whether Flores has plausibly alleged that VDOC discharged her, at least in part, on the basis of her sex.

The Supreme Court's recent decision, *Bostock v. Clayton County*, provides helpful guidance and elaborates on the framework for Title VII discrimination on the basis of sex. 140 S. Ct. 1731 (2020). In *Bostock*, the Supreme Court held that Title VII prohibits employment discrimination against homosexual or transgender people. *Id.* at 1743. In so holding, the Court reiterated that the language in Title VII—"because of . . . sex"—is the equivalent of "but-for causation." *Id.* at 1739. Justice Gorsuch described this as "a sweeping standard" because events frequently have "multiple but-for causes." *Id.* Ultimately, "[w]hen it comes to Title VII, the adoption of the traditional but-for causation standard means a defendant cannot avoid liability

---

described in the complaint must be fabricated. The court finds to the contrary. The facts as alleged indicate that Flores went without a tampon for a short period of time. She went to the restroom approximately two hours after arriving at work (and replacing her first tampon) and realized that she needed to replace her second tampon. Because she had not brought a third tampon into the restroom with her, she placed toilet paper in her underwear. Sgt. Lokey approached her shortly after, and she went through the body scanners for the second time. Then, Flores offered to insert a third tampon to walk through the body scanners for a third time. The court is left with the impression that these latter events happened within a relatively short time frame, and this is certainly not enough to defeat any reasonable inferences that the court must construe in Flores's favor.

just by citing some *other* factor that contributed to its challenged employment decision. So long as the plaintiff's sex was *one* but-for cause of that decision, that is enough to trigger the law." *Id.* (first emphasis in original; second emphasis added).

The Seventh Circuit's decision in *Hall* is also helpful. In that case, the plaintiff was fired after she sought leaves of absence to receive infertility treatments. 534 F.3d at 645–46. The district court held the plaintiff's allegations did not state a Title VII claim "because infertility is a gender-neutral condition entitled to no protection under the language of the PDA." *Id.* at 647. The Seventh Circuit reversed the district court, finding that the plaintiff "was terminated not for the gender-neutral condition of infertility, but rather for the gender-specific quality of childbearing capacity." *Id.* at 649. The court held that "[b]ecause adverse employment action based on childbearing capacity *will always result in 'treatment of a person in a manner which but for that person's sex would be different*,' . . . [the plaintiff's] allegations present a cognizable claim of sex discrimination under Title VII." *Id.* (emphasis added) (citing *City of L.A. v. Manhart*, 435 U.S. 702, 711 (1978)).

This court concludes that Flores has sufficiently alleged that she was discriminated against on the basis of her sex. Examining the sequence of events on July 17, 2019, elucidates the but-for causation. First, Flores entered work and passed through body scanners with a fully saturated tampon because she was on her period. Second, when Flores walked through the body scanners for a second time without a tampon (but instead had temporarily placed toilet paper in her underwear), the second image looked different, creating an anomaly. Third, after she inserted another tampon and walked through the body scanners for a third time, the third image, again, looked different. Finally, even after (1) being presented with evidence that

Flores was on her period, (2) receiving a reasonable explanation for the anomalous images, and (3) being given an opportunity to contact the manufacturer or consult other subject-matter expertise, VDOC still discharged Flores for "suspicion of contraband." This leads the court to conclude, under the facts as alleged, that *but for* Flores's menstruation and use of a tampon—conditions inextricable from her sex and her child-bearing capacity—she would not have been discharged. And discharge based on a woman's child-bearing capacity "will always result in 'treatment of a person in a manner which but for that person's sex would be different.'" *Hall*, 534 F.3d at 659 (citation omitted). For these reasons, Flores's Title VII claim may proceed.

### ii.    Disparate Impact[8]

Facially neutral employment practices may nevertheless violate Title VII. "To establish a prima facie case of disparate[-]impact discrimination under Title VII, a plaintiff must show that the facially neutral employment practice had a significantly discriminatory impact." *Anderson v. Westinghouse Savannah River Co.*, 406 F.3d 248, 265 (4th Cir. 2005) (internal quotation marks omitted) (citation omitted). "[I]t is not enough to simply allege that there is a disparate impact on workers, or [to] point to a generalized policy that leads to such an impact." *Smith v. City of Jackson*, 544 U.S. 228, 241 (2005). "Rather, the employee is responsible for isolating and identifying the *specific* employment practices that are allegedly responsible for any observed statistical disparities." *Id.* (internal quotation marks omitted) (citation omitted). Then, a plaintiff "must allege either the existence of numerical or statistical evidence demonstrating disparate impact or sufficient factual detail of a series of discrete episodes of the contested

---

[8] Flores clarifies in her opposition that she "does not seek to assert an individual or class 'pattern and practice' discrimination claim as suggested by Defendant's brief." (ECF No. 7 at 11 n.3.) This opinion will therefore not address VDOC's "pattern and practice" argument.

employment practice in order to raise a plausible inference that [the employment practice] has a discriminatory impact on [the protected group]." *Medeiros*, 434 F. Supp. 3d at 416 (internal quotation marks and citation omitted) (alterations in original).

The parties' briefing on this issue resembles two ships passing in the night. VDOC points to the since-rescinded policy prohibiting female visitors from using tampons or menstrual cups in VDOC facilities. Flores, on the other hand, states that VDOC "maintains a policy and practice of using body scans to screen employees, and then terminating employees based on the body scans." (Compl. ¶ 40; *see also* ECF No. 7 at 12.) But regardless of what "policy" the court considers for this disparate-impact claim, the claim fails.

"The policy or practice contemplated by disparate[-]impact doctrine consists of more than the mere occurrence of isolated or accidental or sporadic discriminatory acts." *Wright v. Nat'l Archives & Records Serv.*, 609 F.2d 702, 712 (4th Cir. 1979) (internal quotation marks omitted) (citation omitted); *see also Tyree v. GCA Servs. Grp., Inc.*, No. 7:17CV00038, 2018 WL 342066, at *3 (W.D. Va. Jan. 9, 2018). This is why, as noted above, a plaintiff's allegations must include either numerical or statistical evidence, or sufficient factual detail of a series of discrete episodes resulting from the allegedly discriminatory employment practice to raise an inference of a policy's discriminatory impact. *Medeiros*, 434 F. Supp. 3d at 416. Flores's complaint is devoid of numerical or statistical evidence about any policy and does not contain a series of discrete factual allegations of other instances where body-scanning employees has resulted in discrimination. As such, Flores has not stated a plausible disparate-impact claim.[9]

_____

[9] Because the court rejects Flores's disparate-impact claim, there is no need to address VDOC's argument about Flores's failure to exhaust administratively her remedies on those same grounds. The court will accordingly deny as moot VDOC's motion to dismiss Flores's disparate-impact claim under Rule 12(b)(1), which VDOC brought "in an abundance of caution." (*See* ECF No. 5 at 14 n.7.)

## B.    Punitive Damages

Finally, VDOC argues that Flores's demand for punitive damages must be "dismissed with prejudice" because Title VII prohibits punitive damages to be levied against any "government, government agency or political subdivision." (ECF No. 5 at 14 (citing 42 U.S.C. § 1981a(b)(1)).) In her opposition, Flores withdrew her request for punitive damages while maintaining her request for compensatory damages. (ECF No. 7 at 13.) This court declines to rule on whether a particular remedy is appropriate on a motion to dismiss. *See Charles v. Front Royal Volunteer Fire & Rescue Dep't, Inc.*, 21 F. Supp. 3d 620, 629, 631–32 (W.D. Va. 2014) ("A plain reading of Rule 12(b)(6) indicates that the rule may be used only to dismiss a 'claim' in its entirety. . . As such, the nature of the relief included in the demand for judgment is immaterial to the question of whether a complaint adequately states a claim upon which relief can be granted."). But in any event, as Flores has withdrawn her request, the court will strike the demand for punitive damages in section B of her prayer for relief.

## IV.    CONCLUSION

For the above reasons, the court will grant in part and deny in part VDOC's motion to dismiss (ECF No. 4). Flores's sex-discrimination claim under Title VII may proceed, but her disparate-impact claim will be dismissed. Finally, with her consent, Flores's demand for punitive damages in her prayer for relief will be stricken.

The clerk is directed to forward a copy of this Memorandum Opinion and the accompanying Order to all counsel of record.

**ENTERED** this 22nd day of February, 2021.

*/s/ Thomas T. Cullen*
HON. THOMAS T. CULLEN
UNITED STATES DISTRICT JUDGE