IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
HARRISONBURG DIVISION

| | | |
|---|---|---|
| JOYCE FLORES | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 5:20-cv-00087 |
| | ) | |
| v. | ) | |
| | ) | By: Elizabeth K. Dillon |
| VIRGINIA DEPARTMENT OF | ) | United States District Judge |
| CORRECTIONS, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION**

Pending before the court are defendant Virginia Department of Corrections' ("VDOC") motion for judgment as a matter of law (Dkt. No. 198), plaintiff Joyce Flores's motion for an award of back pay damages (Dkt. No. 192), and Flores's motion for attorneys' fees and costs (Dkt. No. 194).  Following a hearing, each is ripe for resolution.[1]  For the reasons stated herein, VDOC's motion for judgment as a matter of law will be denied, and Flores's motions for an award of back pay damages and for attorneys' fees and costs will be granted in part and denied in part.  The court will award $93,808 in back pay with 6% per annum pre-judgment interest accruing from July 31, 2019, $147,842.50 in attorneys' fees, and $17,045.22 in costs. Because of a lack of detailed information, the court declines to rule on the reasonableness of the costs associated with the two expert witnesses, but it will allow Flores to provide additional information about those costs in a renewed motion, if she so chooses.

I.   INTRODUCTION

In March 2019, Flores began work as a dental hygienist at VDOC's Augusta Correctional Center ("ACC").  On July 17, 2019, Flores went through a standard security scan

---

[1]  At the hearing, the court indicated that it intended to deny VDOC's motion for judgment as a matter of law but that it would nevertheless issue a written opinion as to that motion.  The relevant portion of this opinion reflects the court's reasoning.

to enter ACC.  The scan produced an "abnormal image" displaying an object visible in

Flores's lower body cavity.  VDOC employees believed Flores might be smuggling

contraband into the facility, but Flores insists that the object was a tampon.  Later, VDOC

subjected Flores to a second scan, which did not show the same object.  Flores explained that

she had replaced her tampon with toilet tissue after using the restroom.  Flores then inserted a

tampon and was scanned a third time.  Approximately two weeks later, on July 31, 2019, the

warden of ACC terminated Flores's employment.

On November 25, 2020, Flores brought this sex-discrimination suit against VDOC

pursuant to Title VII of the Civil Rights Act.  (Dkt. No. 1.)  VDOC moved to dismiss the

complaint in its entirety, and the court found that although Flores had not stated a viable

"disparate-impact" claim under Title VII, she did plausibly allege that VDOC violated Title

VII under a "disparate-treatment" theory.[2]  (Dkt. No. 15.)  On August 26, 2021, the court

denied VDOC's motion for summary judgment on the disparate-treatment claim, concluding

that Flores had adduced sufficient circumstantial evidence from which a jury could find that

VDOC intentionally discriminated against her on the basis of sex and that there remained

genuine disputes of material fact on that claim.  (Dkt. No. 94.)

On September 13, 2022, Flores's disparate-treatment claim proceeded to trial.  At the

conclusion of Flores's case in chief, VDOC moved for judgment as a matter of law pursuant to

Federal Rule of Civil Procedure 50(b).  (Day 2 Trial Tr. 40:16–23, Dkt. No. 186.)  The court

denied the motion, adopting by reference the reasoning offered in the summary-judgment

order and finding that a reasonable jury could find for Flores given her testimony and other

---

[2] "Title VII prohibits both 'overt discrimination,' known as 'disparate[-]treatment discrimination,' and 'practices that are fair in form, but discriminatory in operation,' known as 'disparate[-]impact discrimination.'" *Medeiros v. Wal-Mart, Inc.*, 434 F. Supp. 3d 395, 411 (W.D. Va. 2020) (citation omitted).  Flores brought disparate-treatment and disparate-impact claims, though only the former proceeded to trial.

circumstantial evidence.  (*Id.* at 46:22–47:6.)

On September 15, 2022, after a three-day trial, a jury returned an $85,000 verdict for Flores on her disparate-treatment claim.  (Dkt. No. 184.)  Following trial, VDOC renewed its motion for judgment as a matter of law (Dkt. No. 198), and Flores filed motions both for an award of back-pay damages (Dkt. No. 192) and for attorneys' fees and costs (Dkt. No. 194).

## II.  DISCUSSION

### A.  VDOC's Motion for Judgment as a Matter of Law

#### 1.  Legal standard

A Rule 50 motion for judgment as a matter of law is reviewed under the same standard as that applied in reviewing a motion for summary judgment.  Thus, in considering VDOC's motion, the court must view the evidence in the light most favorable to Flores and draw all reasonable inferences in her favor.  *See Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644–45 (4th Cir. 2002).

A jury verdict will withstand a Rule 50(b) motion unless the nonmovant has presented no substantial evidence to support the jury verdict.  *Stamathis v. Flying J, Inc.*, 389 F.3d 429, 436 (4th Cir. 2004).  A court reviewing a Rule 50(b) motion may neither weigh the evidence nor consider the credibility of the witnesses; rather, the court may only grant the defendant's motion if it determines that substantial evidence does not support the jury's findings.  *See Konkel v. Bob Evans Farms, Inc.*, 165 F.3d 275, 279 (4th Cir. 1999).  In other words, a verdict may not be set aside unless the court "determines that the only conclusion a reasonable trier of fact could draw from the evidence is in favor of the moving party." *Tools USA & Equip. Co. v. Champ Frame Straightening Equip., Inc.*, 87 F.3d 654, 656–57 (4th Cir. 1996) (quoting *Winant v. Bostic*, 5 F.3d 767, 774 (4th Cir. 1993)).

### 2. Analysis

The record developed at trial was substantially similar to the summary-judgment record, and the court is bound by the same deferential legal standard in ruling on VDOC's post-trial motion for judgment as a matter of law as it was when it denied VDOC's motion for summary judgment. Accordingly, for similar reasons as those stated in its summary-judgment order and on the record at trial, the court will deny VDOC's post-trial motion for judgment as a matter of law.

At trial, Flores adduced sufficient circumstantial evidence from which a jury could find that VDOC intentionally discriminated against her on the basis of sex. For one, VDOC's materials for its statewide training on the Adani security body scanning system stated that "nothing should be inside the lower cavity of any person" and that "most contraband will be concealed in the woman [sic] internal body cavity." (Day 1 Trial Tr. 136:3–13, Dkt. No. 185; Dkt. No. 180-2 (training materials).) VDOC based its training on those flawed assumptions even though they plainly contradicted data from one of its own talking points memoranda from September 2018, in which VDOC represented that only 9% of contraband detected in its facilities from January 2016 to September 2018 was in any body cavity—let alone female body cavities in particular. (Day 1 Trial Tr. 145:6–22; Dkt. No. 180-1 ¶ 1 (stipulation as to the content of the talking points memorandum).) Notably, both the primary VDOC investigator of the Flores incident (Sergeant Benjamin Lokey) and the VDOC official who made the decision to terminate Flores's employment (John Woodson, formerly the warden at ACC) attended this training. Moreover, VDOC representatives made multiple public statements indicating that the Adani scanners cannot distinguish between

tampons and contraband in the lower body cavity.[3]  Thus, viewing the evidence in the light most favorable to Flores, a reasonable jury could certainly conclude that, as a result of the prejudicial training they received, Warden Woodson and Sgt. Lokey harbored a discriminatory bias against females with respect to the perceived likelihood that contraband smuggled into ACC will come through females' lower body cavities, and then acted upon that bias in subjecting Flores to additional scrutiny and, ultimately, in choosing to terminate her employment.

Additionally, in denying VDOC's motion for summary judgment, the court observed that "*if* VDOC wrongfully concluded that Flores smuggled contraband into the facility based on the [aforementioned] flawed assumption, inadequate training, technological limitations, and/or inaccurate information provided by investigators who interviewed Flores, then a reasonable jury could conclude that, but-for her menstruation and use of a tampon— conditions inextricable from her sex—VDOC would not have terminated her employment. (Dkt. No. 94 at 1–2 (emphasis in original).)  As a legal matter, that observation remains true today.  And Flores ultimately did introduce sufficient evidence for a reasonable jury to find that VDOC wrongfully concluded she had smuggled contraband into ACC.  In addition to VDOC's candid admissions regarding the deficiencies in its body scanners, trial testimony indicated that, at the time Warden Woodson chose to terminate Flores's employment, the group of ACC officials working on the matter was aware that (1) the Adani scanners were

---

[3] *See, e.g.*, Dkt. No. 180-1 ¶¶ 1 (stipulation as to quote from talking points memorandum stating that the body scanner technology "is not able to distinguish tampons from contraband"), 2 (stipulation as to content of October 15, 2018 letter from VDOC Director Harold Clarke to Virginia Delegate Michael P. Mullin in which he wrote "Unfortunately, while our body scanners are very helpful in the search for contraband, they can only tell us that something is in a body cavity, not what that something is"); 4 (stipulation as to January 2019 statements by VDOC Legislative Liaison Marie Vargo at a Virginia General Assembly hearing that "[w]e can't tell what's in someone as they go through a body scanner. We just can't tell if its [sic] drugs or a tampon.  It just shows if there's something wrong").

generally unable to discern tampons from contraband (Day 1 Trial Tr. 152:21–153:5); (2) Flores insisted she was menstruating and that the anomaly on the body scanner was her tampon (*id.* at 196:4–8); (3) she had an explanation for why she did not immediately replace her first tampon after removing it (*id.* at 191:1–11); (4) she offered to show some menstrual fluid to the special investigator, Lisa Quesenberry, to prove that she was menstruating that day (*id.* at 191:12–19);[4] (5) despite searches of Flores's car and her medical area at ACC, no contraband with any connection to her was ever found (Day 2 Trial Tr. 69:10–18); (6) neither Sergeant Benjamin Lokey, who investigated Flores for allegedly smuggling contraband, nor K9 Officer Preston Henderson, who conducted a K9 search on Flores's car, ever prepared reports on their investigations (*id.* at 93:15–25; 116:9–20); and (7) VDOC did not maintain a record of Flores's body scan images and had only two image photographs.  (Day 1 Trial Tr. 105:7–25.)  Viewing this evidence collectively and in the light most favorable to the non-movant, a reasonable jury could find that, but for Flores's menstruation and use of a tampon, VDOC would not have terminated her employment.

"Questions of intent are hard to decide" at this stage; they "are almost always inferential, and best left to the trier of fact who can observe the witnesses and determine whether explanations hold water."  *Mullins v. Sw. Va. Reg'l Jail Auth.*, No. 1:12-cv-00028, 2013 WL 5945653, at *10 (W.D. Va. Nov. 6, 2013) (quoting *Ferrell v. Harris Ventures, Inc.*, 812 F. Supp. 2d 741, 748 (E.D. Va. 2011)).   This case involved especially sensitive questions of intent—the answers to which could only be found in circumstantial evidence, if at all.  But the sensitivity of those questions is precisely why they are committed to the

---

[4]  Eventually, Flores and Quesenberry went to the bathroom and, at least according to her own testimony, Flores did show Quesenberry a tissue with her menstrual fluid on it.  (Day 1 Trial Tr. 192:2–14.)

perception and discernment of a jury.  Indeed, "when the circumstantial evidence of a

person's intent is ambiguous, the question of intent cannot be resolved on summary

judgment" or, given the similarities between them, a motion for judgment as a matter of law.

*Id.* (quoting *Gen. Analytics Corp. v. CNA Ins. Cos*., 86 F.3d 51, 54 (4th Cir. 1996) (citation

omitted)).

Regardless of whether the court would itself reach the same conclusions as did the

jury, it is nevertheless obligated to uphold the verdict where it is supported by substantial

evidence.  Here, it is.  Thus, the court will deny VDOC's motion for judgment as a matter of

law.

**B.  Flores's Motion for an Award of Back Pay Damages**

**1.  Legal standard**

As a "general rule," the Supreme Court has established that a prevailing plaintiff

under Title VII should be awarded back pay.  *Dennis*, 290 F.3d at 651 (citing *Albemarle

Paper Co. v. Moody*, 422 U.S. 405, 421 (1975)).  "[G]iven a finding of unlawful

discrimination, back-pay should be denied only for reasons which, if applied generally,

would not frustrate the central statutory purposes of eradicating discrimination throughout

the economy and making persons whole for injuries suffered through past discrimination."

*Albemarle Paper Co*., 422 U.S. at 421.  "As part of the process of making the victims of

employment discrimination whole, the offending employer is made responsible only for

losses suffered by the claimant as a result of the discrimination."  *Brady v. Thurston Motor

Lines, Inc*., 753 F.2d 1269, 1278 (4th Cir. 1985) (citing *Ford Motor Co. v. EEOC*, 458 U.S.

219, 231 n.15 (1982)); *see also Johnson v. Shalala*, 991 F.2d 126, 130 (4th Cir. 1993)

(explaining in a footnote that "the specific remedies of back-pay and reinstatement are

dependent upon the proof of some adverse action taken by the employer").

Back-pay calculations typically begin on the date the unlawful employment action occurred, here, the date of Flores's termination, July 31, 2019, (Day 1 Trial Tr. 200:4–8), and end on the date judgment is entered. *Patterson v. Am. Tobacco Co*., 535 F.2d 257, 269 (4th Cir. 1976). Here, however, Flores has cut off her back-pay claim at the date on which she commenced her substitute employment at UVA (Dkt. No. 193 at 5), and the court will do the same. Ordinarily, the award constitutes "the difference between what the employee would have earned had the wrongful conduct not occurred from the period of termination to judgment, and the actual earnings during that period." *Ford v. Rigidply Rafters, Inc*., 984 F. Supp. 386, 389 (D. Md. 1997). The back-pay award "should be fashioned to compensate [the plaintiff] until [she] can obtain a job commensurate with [her] status." *Patterson*, 535 F.2d at 269. But back pay "should only make the wrongly discharged employee monetarily whole under [her] employment contract; it should not provide a windfall." *Cline v. Roadway Express, Inc*., 689 F.2d 481, 490 (4th Cir. 1982). Indeed, an award of back pay may be cut short if a defendant employer demonstrates that a plaintiff failed to properly mitigate damages by other means, or if a plaintiff voluntarily removed herself from the labor market. *See Kirsch v. Fleet St., Ltd.*, 148 F.3d 149, (2d Cir. 1998) ("The back-pay period ends prior to judgment, however, if the plaintiff has theretofore retired, for 'a discriminatee is not entitled to back pay to the extent that he fails to remain in the labor market.'" (citations and quotations omitted)).

"When the employee fulfills the initial burden of producing evidence establishing an entitlement to back pay, the burden shifts to the employer to prove that the employee was not reasonably diligent" in searching for a new position "and that a reasonable chance of finding comparable employment existed." *Ford*, 984 F. Supp. at 389. Title VII provides, in

pertinent part, that "[i]nterim earnings or *amounts earnable with reasonable diligence* by the person or persons discriminated against shall operate to reduce the back pay otherwise allowable." 42 U.S.C § 2000e-5(g)(1) (emphasis added). "This duty [to mitigate], rooted in an ancient principle of law, requires the claimant to use reasonable diligence in finding other suitable employment." *Ford Motor Co*., 458 U.S. at 231.

"Several courts have recognized that a defendant employer may demonstrate that a plaintiff has failed to mitigate damages by 'establishing (1) that suitable work existed, and (2) that the employee did not make reasonable efforts to obtain it.'" *Crump v. U.S. Dep't of Navy*, 205 F. Supp. 3d 730, 745 (E.D. Va. 2016) (quoting *Broadnax v. City of New Haven*, 415 F.3d 265, 268 (2d Cir. 2005) (internal quotations omitted); *EEOC v. Ilona of Hungary, Inc*., 108 F.3d 1569, 1581 (7th Cir. 1997) (same) (citations omitted)). An employer ordinarily must come forward with evidence that comparable work is available unless the employer can demonstrate that the plaintiff "made no reasonable attempt to find work." *Wagner v. Dillard Dep't Stores, Inc*., 17 F. App'x. 141, 153 (4th Cir. 2001). Moreover, "[t]he reasonableness of a worker's effort to secure substantially equivalent employment is determined by, *inter alia*, the economic climate in which the worker finds [herself], the worker's skills and qualifications, and the worker's age and personal limitations." *Lundy Packing Co. v. NLRB*, 856 F.2d 627, 629 (4th Cir. 1988). A plaintiff "need not go into another line of work, accept a demotion, or take a demeaning position" to demonstrate a good-faith effort at mitigation. *Brady*, 753 F.2d at 1274 (quoting *Ford Motor Co.*, 458 U.S. at 231). The "central purpose" of back pay is at all times to make the plaintiff whole, "returning [her] to the financial position [she] would have been in had the unlawful discrimination not occurred." *Id.* at 1278 (internal citations omitted).

Title VII also authorizes prejudgment interest as part of the back-pay remedy. *Brown v. Mountainview Cutters, LLC*, 222 F. Supp. 3d 504, 511 (W.D. Va. 2016) (quoting *Loeffler v. Frank*, 486 U.S. 549, 557–58 (1988)). The rate of prejudgment interest for cases involving federal questions is a matter left to the discretion of the district court. *United States v. Dollar Rent A Car Systems, Inc.*, 712 F.2d 938, 940 (4th Cir. 1983) (citing *E.E.O.C. v. Liggett & Myers, Inc.*, 690 F.2d 1072, 1074 (4th Cir. 1982)). The Fourth Circuit has recognized the propriety of the trial court's resort to a state's statutory interest rate as the rate of prejudgment interest in cases involving a federal cause of action. *See Quesinberry v. Life Ins. Co. of N. Am.*, 987 F.2d 1017, 1031 (4th Cir. 1993). The applicable Virginia statute governing prejudgment interest is Virginia Code Ann. § 6.02–302, which prescribes a prejudgment interest rate of 6% annually. *See, e.g., Cooper v. Paychex, Inc.*, 960 F. Supp. 966, 974 (E.D. Va. 1997) (applying the Virginia statutory rate to a Title VII judgment), *aff'd*, 163 F.3d 598 (4th Cir. 1998).

### 2. Analysis

    *a. Although Flores is presumptively entitled to backpay as a prevailing Title VII plaintiff, her recovery must be reduced given her limited mitigation efforts.*

At the outset, no party disputes that, following a verdict in her favor at trial, Flores is a "prevailing plaintiff" in this case. *See Dennis*, 290 F.3d at 651. Thus, the court presumes that she is entitled to an award of back pay constituting "the difference between what [Flores] would have earned had the wrongful conduct not occurred from the period of termination to judgment, and the actual earnings during that period." *Ford*, 984 F. Supp. at 389. Flores earned an average of $1,804 per week in 2019 while working at ACC. (Interrog. Resps. at 6, Dkt. No. 193-2.) VDOC put Flores on administrative leave (without pay) on July 17, 2019, and terminated her employment at ACC on July 31, 2019. (Day 1 Trial Tr. 200:4–8.) She

then was out of work without pay for about 69 weeks, until she was hired to work as a dental

hygienist at the University of Virginia on November 16, 2020.  (*Id.*)  Had she remained

employed at ACC during those 69 weeks at her 2019 average weekly salary, Flores would

have earned an additional $124,476.  Thus, absent a showing by VDOC to the contrary, Flores

is presumptively entitled to damages in this amount, plus prejudgment interest.

      VDOC makes a compelling argument, however, that Flores did not make reasonably

diligent efforts to find a new job.  The court agrees to an extent and bases its conclusion not

just on the number of applications she submitted, but most especially on the types of

positions to which she applied.  During her 15-plus months of unemployment, Flores applied

to a total of 25 positions.  Submitting only 25 job applications over that period of time is not

in itself unacceptable; indeed, courts in this circuit have awarded back pay to plaintiffs who

applied to even fewer openings.  *See, e.g.*, *Owen v. Rutherford Supply Corp.*, No.

3:19cv2252-HEH, 2020 WL 4018937, at *4 (E.D. Va. July 16, 2020) (awarding full back pay

to a prevailing Title VII plaintiff who had applied to about 20 or 21 positions without success

over a 1.5-year period).  But here, the reasonableness of that number is undercut by a number

of factors.

      First, most of Flores's applications were to positions in academia—the industry in

which she worked before taking the entry-level hygienist role at ACC—and all of those

positions were with one university (the University of Virginia).  These positions were not out

of line with her pre-ACC employment, and the Fourth Circuit has found that adequate

mitigation can occur where a plaintiff seeks—and obtains—a job in a different industry.

*E.g.*, *Cline*, 689 F.2d at 488–89 (concluding a plaintiff sufficiently mitigated his damages

where he obtained a realtor's license and went into the real estate business after being

illegally fired from his job in the trucking industry, even though he earned less money in the real estate business).  But here, Flores primarily sought—and failed to obtain—a position in a different industry for more than a year, when (as discussed in more detail below) jobs in the same field were likely available during that time.  Moreover, all of her applications for academic jobs were submitted to the same employer.

Second, Flores did not apply to any dental hygienist positions that were entry-level or required no experience, despite the fact that the ACC job was technically an entry-level job requiring only a certificate or an associate degree.  Flores testified at her deposition that she did not apply to any hygiene jobs that were listed as "entry-level" or "no experience necessary" and would only apply to certain experienced roles that were "in the setting where [she] wanted to apply [her] experience, . . . degrees, and . . . licensure."  (Flores Dep. 214:23–215:4, Dkt. No. 196-1.)

The court finds that this factor should affect Flores's back-pay award, but only slightly.   The refusal to apply to entry-level positions was largely understandable, particularly based on salary discrepancies between her ACC position and other entry-level positions.  Specifically, Flores testified that she made $48 per hour and worked an average of 37 hours per week (which she estimated would amount to annualized wages of $93,000 per year)[5] in her entry-level dental hygienist role at ACC.  (Day 1 Trial Tr. 171:18–23.)  VDOC's own vocational expert testified, though, that the median income for dental hygienists in Virginia during the period of Flores's unemployment was between $50,000 and

---

[5]  This figure is very close to annual wages of $93,808, which is the figure if calculated based on her actual average weekly earnings of $1804.

$70,000. (Deposition of H. Gary Broughton ["Broughton Dep."] 27:3–24, Dkt. No. 196-3.)[6] As such, Flores's pay at ACC for entry-level work far exceeded the median income for *all* dental hygienists in Virginia during her period of unemployment, let alone for entry-level hygienists. Thus, if Flores were limited to applying to dental hygienist jobs (and if the above figures on median incomes are any indication), her pay likely would have been less regardless of whether such a job was entry-level or not. Thus, although she could have applied more widely to a broader range of hygienist positions, her failure to do so supports only the slightest reduction in damages.

A third factor warranting a slight reduction in her back pay is that Flores largely limited her dental hygienist applications to public sector jobs. Indeed, only two of the eight hygienist positions to which she applied were in the private sector. She claims that the primary reason for this was her "need and want" for Virginia Retirement System (VRS) benefits. (Flores Dep. 214:23–215:4.) She had access to such benefits when she was a professor of dental hygiene at Old Dominion University before taking the ACC job. But limiting herself to jobs with VRS benefits is particularly problematic in light of her admission that she did not have VRS benefits in the ACC position. Flores also failed to engage any staffing companies about another position, despite having been placed at her ACC job by a staffing agency. Broadening her search to positions without VRS benefits and using a staffing agency were both reasonable courses of action that she declined to take to obtain a job sooner.

Fourth, Flores insists that her search was complicated by the COVID-19 pandemic

---

[6] The parties stipulated to the taking of Broughton's deposition for the purpose of preserving his testimony for back pay issues, given that he was unavailable to testify at trial.

(Day 1 Trial Tr. 205:20–206:3), but this contention conflicts with other evidence.  For example, her assignment at ACC ended over six months before the pandemic forced shutdowns in Virginia in March 2020.  By that point, Flores had applied for fifteen jobs, only four of which were dental hygienist positions.  And the restrictions on non-urgent dental visits in Virginia expired on May 1, 2020, and were not reinstated.  Moreover, VDOC's vocational expert, Broughton, opined, in relevant part, that (1) according to the U.S. Bureau of Labor Statistics, the job outlook for dental hygienists was projected to grow faster than the average for all occupations from 2019 going forward; (2) according to the Virginia Department of Health Professions' Dental Hygienist Workforce Data Center, the number of licensed dental hygienists in Virginia had increased by 8% from 2019 to 2020 and their median annual income in 2019 was between $50,000 and $60,000 (and then increased to between $60,000 and $70,000 in 2020); and (3) at the time Broughton conducted his labor market survey in June 2021, there were "plenty of jobs in Richmond and the Williamsburg area" in dental hygiene and Flores "should have probably had at least 20 contacts or so a month finding jobs."  (Broughton Dep. 16:1–7, 27:3–24, 15:17–25, 16:19–23.)

Although the court relies to some degree on Broughton's testimony, his opinions are not as favorable to VDOC as they first sound, for several reasons.  In particular, VDOC's arguments based on Broughton's testimony ignore several important realities of Flores's situation that would have influenced the focus of her job search, and its arguments fail to acknowledge related gaps in Broughton's testimony.  For starters, Broughton did not account for the relatively high salary of Flores's ACC position, as the court discussed previously.  If she had applied only to dental hygienist jobs, her employment prospects likely would entail about a 20–25% reduction in annual salary.  To the extent a job requiring such a steep pay

14

cut could be fairly considered a "demotion" or a "demeaning position," *see Miller*, 250 F.3d at 838, Flores was not required to cabin her search to only those jobs. Indeed, given "the economic climate in which [she found herself]" and her "skills and qualifications," *see Lundy Packing Co.*, 856 F.2d at 629, it made some sense to apply to other positions, as well as dental hygienist positions.[7]

Moreover, Broughton's expert opinion was, in some respects, based in part on inapposite data and at times failed to consider certain key details about the circumstances of Flores's job search and her prior employment. Most prominently, Broughton conducted his labor market survey (which included contacting several dental offices) in June 2021—several months after Flores had already found work and well after the back pay timeframe. And according to Broughton, even at that time, dental practices were still in the process of rehiring people who were laid off during the COVID-19 pandemic shutdowns—over a year after the restrictions on non-urgent dental visits in Virginia were lifted. (Broughton Dep. 21:4–12.) Additionally, even though Flores focused her search on jobs with government entities (like her previous position with ACC), Broughton did not take that into account in conducting his labor market survey, nor was he even aware that Flores's search was so limited. (*Id.* at 21:15–19.) Thus, while Broughton's testimony provides some support for the

---

[7] VDOC cites out-of-circuit authority—*Sellers v. Delgado Community College*, 839 F.2d 1132, 1139 (11th Cir. 1988)—for the proposition that Flores was required to seek employment that afforded "virtually identical promotional opportunities, compensation, job responsibilities, working conditions, and status" as the job from which she was terminated. (*See* Dkt. No. 196 at 6 (citing *Sellers*, 839 F.2d at 1138).) Of course, this court is not bound by the *Sellers* court's characterization of a Title VII claimant's duty to mitigate. But even if it were, VDOC ignores aspects of that framework that might not cut in its favor. Specifically, while a teaching/education position clearly does not involve the same "job responsibilities" as the ACC position, VDOC fails to consider whether those jobs offer similar "compensation," "promotional opportunities," "working conditions, [or] status" as did Flores's position at ACC. In the same vein, VDOC criticizes Flores for only applying to two private dental offices (Dkt. No. 196 at 8) without acknowledging that her prior job was at a government facility and that switching to a private dental office might involve differences in working conditions, promotional opportunities, compensation, or other aspects of employment.

proposition that Flores could have done more to obtain work sooner, it is not a strong condemnation of her efforts, given its failings and under all of the circumstances just discussed.

Ultimately, in considering Flores's mitigation efforts, the court must strike a balance. On one hand, Flores's efforts at seeking substantially equivalent employment leave much to be desired, and two-thirds of the jobs she applied to were in a different vocation than the job from which she was terminated. Had Flores made a more concerted effort to secure a dental hygienist position, it is highly likely that she would have found such a job much sooner than November 2020 and could have claimed any difference in salary as back pay. Any back pay award must account for that. On the other hand, Flores's situation was unique—she had 20 years' experience in dental hygiene (including several years of teaching in the field) yet was working in an "entry-level" dental hygienist role that, for one reason or another, paid tens of thousands of dollars more than the median salary in the profession statewide.

Given the evidence presented and in light of the presumption in favor of back pay, the court finds that the most appropriate award in this case would be one year's back pay—*i.e.*, Flores's average weekly salary of $1,804 per week, multiplied by 52 weeks, for a total of $93,808. However, VDOC has also presented argument as to two collateral issues affecting the back pay award, which the court will now consider.

> b. *The court will not offset the back pay award by $11,000 to account for the unemployment benefits Flores received during the back pay period.*

In her sworn interrogatory responses, Flores stated that she "received approximately $11,000 in unemployment benefits." (Interrog. Resps. 8.) However, she did not provide the exact amount she received in benefits, nor did she distinguish between how much money came from the federal government as opposed to the Commonwealth of Virginia. VDOC argues

that, to the extent Flores is entitled to any back pay, it should be offset by $11,000 to account for those unemployment benefits.

In cases involving private employers, courts often decline to reduce the back pay award by benefits received a source other than the private employer, such as government unemployment benefits. *Sloas v. CSX Transp., Inc*., 616 F.3d 380, 389 (4th Cir. 2010) (stating that the collateral source rule provides that "compensation from a collateral source should be disregarded in assessing tort damages"); *see also Reed v. VDOC*, No. 7:13-CV-00543, 2014 WL 5810463, at *2 (W.D. Va. Nov. 7, 2014) (citing *Craig v. Y & Y Snacks, Inc*., 721 F.2d 77, 81–85 (3d Cir. 1983) (affirming decision not to deduct benefits in a Title VII case)).  That said, "courts have applied this collateral source rule more narrowly in cases where the defendant is a government entity." *Id.* at *3 (citing *Sloas*, 616 F.3d at 389 n.9).  "In such cases, courts may consider the source of the benefits, without more, to determine whether they are collateral." *Id.* (internal quotations omitted).  Thus, where "both the benefits and the back pay come from the same source—the [state] government," those benefits should generally offset the back pay award. *See Szedlock v. Tenet*, 61 F. App'x 88, 89–90 (4th Cir. 2003).

Here, though, VDOC is not entitled to an $11,000 offset of the back pay award.  The court agrees with VDOC's argument, on brief and at the motion hearing, that the collateral source rule should not apply here because, although NCVA Staffing (the company that placed Flores at ACC) was the formal employer, in substance the state paid the unemployment benefits.  However, what prevents the court from issuing an offset is ambiguity as to the source of the unemployment benefits.  Although Flores swore that she received approximately $11,000 in unemployment benefits, the record does not reflect any documentation or sworn testimony from which the court could either (1) ascertain the precise amount of total benefits

she received, or (2) discern how much of that money came from state funds versus federal funds.[8]  Without that information, the court is left to guess how much money should be subtracted from Flores's back pay award; that speculation is not a sound basis to reduce the award.  Moreover (and, perhaps, most importantly), to the extent the back pay award fails to account for state unemployment benefits paid to Flores, the Commonwealth is not without a remedy; indeed, Virginia law requires reimbursement of state unemployment funds for benefits paid that overlap with back-pay awards.  *See* Va. Code § 60.2-634.

For those reasons, the court will not reduce the back pay award by $11,000, as VDOC requests.

> ### c.   *The court will neither limit the back-pay period to eight months nor limit the prejudgment interest period to the original trial date.*

VDOC argues that the court should reduce the back-pay period to a total of eight months because Flores was assigned to work at ACC under a one-year contract with no guarantee of renewal (though the contract could have been extended, to the extent mutually agreed upon by the parties) and had already worked at ACC for about four months at the time of her termination.  (Day 1 Trial Tr. 162:2–9.)  In doing so, VDOC seemingly misunderstands the nature and extent of the back pay remedy; many employment discrimination plaintiffs (and, for that matter most employees generally) are employed at will without any contractual guarantees of employment, yet they nevertheless receive full back-pay awards to the extent they prevail on their claims.  In any event, VDOC fails to cite any authority for the proposition that a court can or should reduce the award based on the length of Flores's contract, especially

---

[8]  On brief, Flores represented that, beginning in March 2020, her unemployment benefits were in large part funded by the federal government pursuant to the CARES Act of 2020, which automatically provided payments of $600 a week for individuals who were eligible due to the COVID-19 pandemic shutdowns.  (Dkt. No. 200 at 6.)

given that she intended to stay in that job for "a very long time" and had no discernable performance issues. (Day 1 Trial Tr. 170:15–171:17). As such, this court will decline to do so.

Lastly, VDOC asks the court to cut off any prejudgment interest at the date on which the case was originally set for trial—October 13, 2021. "The essential rationale for awarding prejudgment interest is to ensure that an injured party is fully compensated for its loss." *Feldman's Med. Ctr. Pharm. Inc. v. CareFirst, Inc*., 823 F. Supp. 2d 307, 324 (D. Md. 2011) (citing *City of Milwaukee v. Cement Div., Nat'l Gypsum Co*., 515 U.S. 189, 195 (1995)). Like back pay, whether to award prejudgment interest is a remedy left to the trial court's discretion. *See Maksymchuk v. Frank*, 987 F.2d 1072, 1077 (4th Cir. 1993) (citing *United States v. Gregory*, 818 F.2d 1114, 1118 (4th Cir. 1987)). The court understands that VDOC was ready for a trial in October 2021, and a scheduling conflict with the then-presiding district judge caused it to be rescheduled.[9] But cutting off interest on that date would contravene the purpose of awarding prejudgment interest—providing the plaintiff with full compensation. As other courts have recognized, it may be appropriate for a court to limit prejudgment interest "when *the party seeking prejudgment interest* requested a stay or continuance that resulted in a delay of the trial." *See Pierce Mfg. v. E-One, Inc*., No. 8:18cv617, 2022 WL 479804, at *2 (M.D. Fla. Feb. 16, 2022). But Flores did not do so in this case. As such, the court will not reduce the prejudgment interest period.

In sum, the court will grant in part and deny in part Flores's motion for an award of back-pay damages; specifically, the court finds that Flores is entitled to $93,808 of back pay

---

[9] Flores points out that, when the scheduling conflict arose, the then-presiding district judge offered new trial dates in November and December 2021, but that VDOC's prior counsel was unavailable then and requested that trial not be reset until April or May 2022. (Dkt. No. 200 at 9.)

(an amount equivalent to 52 weeks of her average weekly pay during the year in which she was terminated), plus 6% annual prejudgment interest, pursuant to Virginia Code Ann. § 6.02–302, accruing from July 31, 2019.

## C. Flores's Motion for Attorneys' Fees and Costs

### 1. Legal standard

A prevailing party in a Title VII action "should ordinarily recover an attorney's fee unless special circumstances would render such an award unjust." *Hensley v. Eckerhart*, 461 U.S. 424, 429 (1983); *see* 42 U.S.C. § 2000e–5(k) ("In any action or proceeding under this subchapter[,] the court, in its discretion, may allow the prevailing party . . . a reasonable attorney's fee . . . as part of the costs . . . ."). A prevailing party is the party that "succeed[s] on any significant issue in litigation which achieves some . . . benefit [to] the part[y] bringing suit." *Hensley*, 461 U.S. at 433. Given the jury's verdict in Flores's favor, it is undisputed that she is a prevailing party.

To calculate reasonable attorneys' fees, the Fourth Circuit has articulated a three-step process. *See, e.g.*, *McAfee v. Boczar*, 738 F.3d 81, 88 (4th Cir. 2013). The court must first calculate the lodestar amount—that is, it must multiply the number of reasonable hours expended by the reasonable rate the attorney charged to assist in bringing the plaintiff's claims. *Id*. To determine what is "reasonable in terms of hours expended and the rate charged," courts apply the factors set forth in *Johnson v. Georgia Highway Express Inc.*, 488 F.2d 714, 717–19 (5th Cir. 1974).[10] However, courts are not bound to "become green-

---

[10] The Fourth Circuit adopted the *Johnson* factors in *Barber v. Kimbrell's Inc.*, 577 F.2d 216, 226 (4th Cir. 1978). The factors to be considered are: (1) the time and labor expended; (2) the novelty and difficulty of the questions raised; (3) the skill required to properly perform the legal services rendered; (4) the attorney's opportunity costs in pressing the instant litigation; (5) the customary fee for like work; (6) the attorney's expectations at the outset of the litigation; (7) the time limitations imposed by the client or circumstances; (8) the amount in controversy and the results obtained; (9) the experience, reputation and ability of the attorney; (10) the

eyeshade accountants." *Fox v. Vice*, 563 U.S. 826, 838 (2011).  The "essential goal" of

shifting fees is "not to achieve auditing perfection," but to ensure that "rough justice" is

done.  *Id*.  The court retains broad discretion to take in its "overall sense of [the] litigation,"

and may "modify the lodestar to more accurately reflect the extent of a litigant's success."

*Id*.; *Lux v. Judd*, 868 F. Supp. 2d 519, 533 (E.D. Va. 2012).

Once it has determined the lodestar amount, the court must then subtract any hours

spent in the litigation that did not relate to or otherwise advance the prevailing party's

successful claims.  *McAfee*, 738 F.3d at 88.  Finally, the court should "award some

percentage of the remaining amount, depending on the degree of success enjoyed by the

plaintiff."  *Id*. (internal quotations omitted).  The Supreme Court has repeatedly emphasized

the "strong presumption" that the lodestar amount accounts for reasonable fees.  *See, e.g.*,

*Perdue v. Kenny A. ex rel. Winn*, 559 U.S. 542, 554 (2010).  Though the lodestar is not

conclusive as a matter of course, courts generally may not make subsequent adjustments to

the lodestar according to any factor that the lodestar calculation necessarily considered.  *Id*. at

553.

Additionally, Title VII authorizes the court to award reasonable out-of-pocket

expenses incurred by the attorney as are normally charged to a client while providing legal

services.  *See* 42 U.S.C. § 2000e-5(k).  "The moving party must substantiate, with a

reasonable degree of specificity, those costs and expenses associated with the underlying

litigation."  *Design & Prod. Inc. v. Am. Exhibitions, Inc.*, No. 1:10–cv–899, 2011 WL

6002598, at *4 (E.D. Va. Nov. 30, 2011).

---

undesirability of the case within the legal community in which the suit arose; (11) the nature and length of the
professional relationship between attorney and client; and (12) attorneys' fees awards in similar cases.
*McAfee*, 738 F.3d at 88 n.5.

### 2.  Analysis—attorneys' fees

The following chart represents the figures Flores provided in support of her lodestar calculation.

| Timekeeper | Hourly Rate | Hours | Total |
|---|---|---|---|
| Paul Falabella (PMF) | $325 | 462.8 | $150,410.00 |
| Samantha Galina (SG) | $200 | 39.1 | $7,820.00 |
| Paralegals (EB/LA) | $135 | 57.1 | $7,708.50 |
| Travel time (PMF/SG) | $100 | 17.0 | $1,700.00 |
| **Total to date:** | -- | **576.0** | **$167,638.50** |

(*See* Dkt. No. 195 at 8.)  In addition to the hours captured in the above chart, Flores estimates an additional 20 hours of work by counsel in preparing reply briefs in support of her motions for back pay and for attorneys' fees (*id.*)—16 hours by Mr. Falabella and 4 hours by Ms. Galina, both billing at the above rates.

### a.  *Reasonable hourly rates*

Generally, courts determine whether an hourly rate is reasonable by comparing the rate proffered by the prevailing party's counsel with other prevailing rates in the same legal community for the same work.  *McAfee*, 738 F.3d at 91.  The "first place to look in evaluating the prevailing market rate" is the community in which the court itself sits.  *Rum Creek Coal Sales, Inc. v. Caperton*, 31 F.3d 169, 179 (4th Cir. 1994).  The reasonable rate is "established through affidavits reciting the fees of counsel with similar qualifications, information concerning fee awards in similar cases, and/or specific evidence of counsel's billing practice."  *Freeman v. Potter*, No. 7:04-cv-00276, 2006 WL 2631722, at *4 (W.D. Va. Sept. 13, 2006) (citing *Spell v. McDaniel*, 824 F.2d 1380, 1402 (4th Cir. 1987)).

Flores's counsel submitted an affidavit attesting that the above rates are reasonable, given counsel's experience and qualifications.  (*See* Dkt. No. 195-1.)  Counsel also provided affidavits from two other attorneys who state that they actively practice employment law in the Western District of Virginia and that they are familiar with Mr. Falabella's and Ms. Galina's educational backgrounds and levels of expertise: Mr. Tim Cupp (Dkt. No. 195-3) and Mr. Paul Beers (Dkt. No. 195-4.)  These individuals aver that, given counsel's qualifications and experience, the above rates are reasonable.  (Dkt No. 195-3 at 5–6; Dkt. No. 195-4 at 2.)  Attorneys' fee awards in other federal employment law cases in this district also indicate the rates sought by counsel are reasonable.  *See, e.g.*, *Brown v. Mountainview Cutters, LLC*, 222 F. Supp. 3d 504, 511 (W.D. Va. 2016) (finding that hourly rates of $350 and $225 for lead and associate attorney, respectively, in Title VII case were reasonable).  VDOC raises several objections to Flores's claim for attorneys' fees, but it has not objected to the rate itself.  (*See generally* Dkt. No. 197 at 4.)  Thus, having reviewed the affidavits submitted and fee awards in similar cases, the court finds that an hourly rate of $325 is reasonable for the work performed by Mr. Falabella, that an hourly rate of $200 is reasonable for the work performed by Ms. Galina, and that an hourly rate of $135 is reasonable for work performed by paralegals.  The court will apply these rates when calculating the fee award in this case.

   *b.   Reasonable hours expended*

The court next addresses whether Flores is entitled to compensation for all hours incurred in preparation for her case.  Flores seeks to be compensated for 478.8 hours billed by Mr. Falabella, 43.1 hours billed by Ms. Galina, 57.1 hours billed by paralegals, and 17

hours billed to travel, for a total of 596 hours.[11]  (*See* Dkt. No. 195 at 8.)  VDOC argues that

the hours expended by Flores's counsel were duplicative, excessive, vague, and were

occasionally clerical to the degree that they "are not compensable."  (Dkt. No. 197 at 3–6)

(citing *Abusamhadaneh v. Taylor*, No. 1:11cv939, 2013 WL 193778 (E.D. Va. Jan. 17,

2013)).

      First, the use of excessively vague time descriptions is a generally disfavored billing

practice.  Such descriptions "inhibit the court's reasonableness review" and also "justify a

percentage reduction in the fee awarded."  *Ashley II of Charleston, LLC v. PCS Nitrogen,*

*Inc.*, No. 2:05–2782, 2015 WL 4469765, at *10 (D.S.C. July 21, 2015) (citing cases).  "These

entries provide no insight as to the particular tasks performed beyond preparing" for some

event or circumstance in the litigation, "nor do they indicate the specific reasons for such

time spent."  *Stultz v. Virginia*, No. 7:13-cv-589, 2019 WL 4741315, at *6 (W.D. Va. Aug.

15, 2019), *report and recommendation adopted as modified on other grounds*, 2019 WL

4740241 (W.D. Va. Sept. 27, 2019).  Without this information, "it is impossible to verify[,]

as the statute requires[,] the reasonableness of the billings, either as to the necessity of the

particular service or the total amount of time expended on a given task."  *In re Meese*, 907

F.2d 1192, 1204 (D.C. Cir. 1990).  The court agrees with VDOC that a portion of Flores's

counsel's entries describe the tasks performed by counsel with insufficient detail.  Examples

of such entries include "prepare for deposition," "prepare for hearing," "conference team on

re-assign[ment]," and "rec[ei]ve/review VDOC filing."  (*See, e.g.*, Dkt. No. 195-2 at 14, 31,

38.)  Counsel also summarily billed for several "call[s]" with and "[e]mail update[s]" to

---

[11]  The hours calculations for Mr. Falabella and Ms. Galina include the 20 estimated additional hours spent on further post-trial briefing.

representatives of the American Civil Liberties Union. (*See, e.g.*, *id.* at 2.) With such little information, the court is left guessing as to whether (and, if so, to what extent) those tasks moved this litigation forward. The vagueness of at least some of counsel's entries weighs in favor of a reduction in the number of hours for which fees will be awarded.

Second, the court notes that "in this circuit . . . purely clerical tasks are ordinarily part of a law office's overhead, (which is covered in the hourly rate)," and should not be separately billed or compensated. *Two Men & A Truck/Int'l, Inc. v. A Mover, Inc.*, 128 F. Supp. 3d 919, 929 (E.D. Va. 2015) (citing cases); *see also Missouri v. Jenkins*, 491 U.S. 274, 288 n.10 (1989) (noting that "purely clerical or secretarial tasks should not be billed at a paralegal rate"). "Examples of clerical tasks include: filing documents with the court, issuing summonses, scanning and mailing documents, reviewing files for information, printing pleadings, organizing documents, creating notebooks or files, assembling binders, emailing documents, and making logistical telephone calls." *Brown*, 222 F. Supp. 3d at 514 (citing *Two Men & A Truck/Int'l, Inc.*, 128 F. Supp. 3d at 929–30). Here, not only do the billing records submitted by Flores include a number of entries for clerical tasks performed by the paralegal ( "[s]can/save RTS," and "[d]ownload and retrieve Defendant's counter deposition designations," among others (*see* Dkt. No. 195-2 at 4, 43)), but the entries also include many clerical tasks performed by Mr. Falabella at his ordinary rate—such as "[e]mail client FOIA documents from EEOC," "[s]end revised Complaint to client for final review," and "[s]end client recent case documents" (*see id* at 6, 24). The court does not necessarily doubt Mr. Falabella's sworn representation that counsel has already written off "paralegal time that [bordered] on administrative work" (*see* Dkt. No. 195-1 ¶ 46). But even with those write-offs, some clerical work—including some billed by Mr. Falabella—remains in these entries,

which justifies a further reduction in the reasonable hour total.

Third, VDOC argues that the attorney hours include some duplicative/excessive work.  The court agrees, but only in part.  To be sure, there are a handful of entries for which either the number of hours expended was unreasonable given counsel's level of experience (*e.g.*, a paralegal billed 1.3 hours to review the court's six-page scheduling order) or the task was not essential to the litigation (most notably, the periodic updates to the ACLU).[12]  At the same time, other time entries that VDOC claims were superfluous were not so.[13] Accordingly, the reasonable hour total should be reduced slightly insofar as the time spent was indeed excessive or duplicative, but not to the extent VDOC requests in its brief.

Lastly, VDOC argues that Flores's counsel engaged in "block billing."  Block billing is generally defined as the practice of combining "several tasks together under a single entry, without specifying the amount of time spent on each particular task."  *Lusk v. Va. Panel Corp.*, 96 F. Supp. 3d 573, 582 (W.D. Va. 2015) (internal quotations omitted).  "The practice is disfavored because it does not provide the court with a sufficient breakdown to support an attorneys' fee request."  *Hurd v. Cardinal Logistics Mgmt. Corp.*, No. 7:17-cv-00319, 2019 WL 6718111, at *4 (W.D. Va. Dec. 10, 2019) (internal quotations omitted).  When presented with evidence of block billing, the court may "reduce the fee award by either identifying the specific hours that are not sufficiently documented or by reducing the overall fee award by a fixed percentage."  *Lusk*, 96 F. Supp. 2d at 583 (internal quotations omitted).

---

[12]  Notably, on brief, Flores did not respond to VDOC's argument as to the excessiveness/unrelatedness of either of these examples.  (*Compare* Dkt. No. 197 at 4 *with* Dkt. No. 201 at 2–3.)

[13]  For example, "[c]ounsel [] billed 2.5 hours and 1.7 hours to 'research/outline trial objections, FRE,'" but VDOC insisted that this was excessive because "counsel should be familiar with both the Federal Rules of Evidence and trial objections given his claimed experience and requested rate."  (Dkt. No. 197 at 4.)  But VDOC seems to rely on a false premise.  The fact that an attorney is familiar with the Federal Rules of Evidence does not mean that any time spent preparing objections for trial with reference to the Federal Rules is entirely excessive.

As this court has previously observed, "*Lusk* provides an excellent example of the type of block billing warranting a fee reduction.  There, counsel include in one entry, 'further legal research and drafting; shepardizing cases; review brief w/ Mr. Schulte; teleconference w/ Ms. Schulte; research and revise brief; read cases [listed]; review Defendant's brief; teleconference Schulte re defenses needed. Client consult; finalize declaration on further efforts to obtain work; 9 hours.'" *Hurd*, 2019 WL 6718111, at *5 (quoting *Lusk*, 96 F. Supp. 3d at 582).  "The court found that 'it is impossible to tell how much time was spent on what particular task in order to determine if the time spent was reasonable.'" *Id.* (quoting *Lusk*, 96 F. Supp. 3d at 583).

Upon review, the court has not identified similar entries in Flores's counsel's entries with enough frequency to warrant a reduction in the fee award, and the court disagrees with VDOC's characterization of those entries.  For example, VDOC claims that Flores's counsel "inappropriately block-billed" by "billing 14.2 hours and 7.9 hours on August 5 and 6, respectively, drafting an opposition to VDOC's summary judgment motion." (Dkt. No. 197 at 5.)  But while each of those entries evidently represent an entire day's worth of hours, they are not block-billed; rather, each of those entries specifies how much time the attorney devoted to that task.  As such, the court will not reduce the fee award on account of block billing.

When a court is unable to find that each and every hour billed by the prevailing party's counsel was reasonable, the court "must exercise sound judgment based on knowledge of the case and litigation experience to reduce the number of hours by an appropriate percentage." *Brown*, 222 F. Supp. 3d at 515.  In doing so here, the court simply cannot ignore the complexities of this case and counsel's diligence in its representation of Flores, from the filing

of her EEOC charge in September 2019 through oral argument on the post-trial motions in December 2022.  In this action, plaintiff's counsel not only lodged novel theories of sex discrimination in relation to one's menstruation and/or use of a tampon (which were fully briefed and argued in two dispositive motions), but counsel also engaged in extensive discovery (including taking 12 depositions and defending another seven), litigated multiple discovery disputes before the magistrate judge, retained three experts against VDOC's five,[14] participated in multiple settlement conferences, opposed several motions in limine by VDOC, tried the case over three days, and briefed/argued three post-trial motions.  Thus, any fee award must appropriately balance the defects in the attorneys' fee request with the fact that this was not a run-of-the-mill employment discrimination case.

Upon its review of the records submitted and its knowledge of the case and others like it, the court finds it appropriate to reduce the number of hours billed by all timekeepers by 15%.  After adding in the hours counsel anticipated spending on the remaining post-trial briefing and subtracting 15% of hours from all timekeepers, plaintiff's counsel is entitled to $147,842.50 in attorneys' fees, as demonstrated in the chart below:

| Timekeeper | Hourly Rate | Reasonable Hours | Total |
|---|---|---|---|
| Paul Falabella (PMF) | $325 | 407 (478.8 – 71.8) | $132,275.00 |
| Samantha Galina (SG) | $200 | 36.6 (43.1 – 6.5) | $7,320.00 |
| Paralegals (EB/LA) | $135 | 48.5 (57.1 – 8.6) | $6,547.50 |
| Travel time (PMF/SG) | $100 | 17.0 | $1,700.00 |
| **Total to date:** | -- | **509.1** | **$147,842.50** |

---

[14]  Importantly, because both the fact of Flores's menstruation and the image from her body scan were in dispute here, this case required the retention of experts on menstruation/feminine hygiene products and the interpretation of body scan images, in addition to the sort of damages expertise often offered in employment discrimination cases.

### 3.  Analysis—costs

Flores requests an award of $53,621.22 in costs pursuant to 42 U.S.C. § 2000e-5(k).

First, Flores seeks $13,079.52 in miscellaneous undisputed costs, which the court will award.

The remainder of the costs sought are (1) expert fees; and (2) deposition and hearing

transcript fees.  Although Flores retained three experts in this case, she only seeks to recover

costs associated with two of them, as the court excluded the third expert—Dr. Sheorn—prior

to trial (*see* Dkt. No. 114).  Flores represents that she has incurred $20,785.57 for Dr.

Munoz's time and expenses and $13,736 for Dr. Haber's time and expenses.  She has also

incurred $3,965.70 in videography costs and $2,440 in real-time transcription costs.  The

court will award some of Flores's requested costs, including her videography costs.  On the

other hand, the request for real-time transcription costs will be denied with prejudice, and the

request for certain costs associated with expert witnesses will be denied without prejudice

pending Flores's filing of a renewed motion and supplementation of the record.

#### a.  Verification of costs

VDOC argues that Flores has failed to substantiate the costs associated with her

expert witnesses and depositions.  Local Rule 54(a)(2) requires a "listing of any expenditures

for which reimbursement is sought" in a motion requesting the award of attorneys' fees and

costs.  *See* W.D. Va. Gen. R. 54(a)(2).  VDOC claims that Flores's documentation regarding

costs "does not meet the standard of reasonable specificity required in the Fourth Circuit to

recover costs." (Dkt. No. 197 at 7.)  "[U]nverified [c]hart[s]" of expenses without receipts or

bills attached are insufficient documentation to award costs." *Trimper v. City of Norfolk*, 58

F.3d 68, 77 (4th Cir. 1995); *see also Denton v. Pennymac Loan Servs., LLC,* 252 F. Supp. 3d

504, 531 (E.D. Va. 2017) (denying award of expenses because plaintiff did not provide

invoices or receipts.)  Here, Flores has provided exhibits that include the amount of each cost, the date it was incurred/paid, and Flores's counsel's sworn verification that the costs are accurate.  (*See* Dkt. No. 195-2 at 57–59; Dkt. No. 195-3.)  On its own, this documentation would likely be insufficient to substantiate those costs.  However, Flores has attached additional invoices to her reply brief reflecting the costs of deposition transcription and videography, as well as the costs of her expert witness, Dr. Munoz, prior to trial.  (*See* Dkt. No. 201-1.)  The court finds that this documentation is sufficient to substantiate these particular costs.  The reasonableness of these costs will be discussed separately below.

Flores has not, however, provided the same detailed verification of costs relating to Dr. Haber's work as an expert witness.  Mr. Falabella's declaration and the document entitled "Disbursements" attached to Flores's motion provide the amounts paid to Dr. Haber, the dates he was paid, and a description of the work he performed in this matter.  (*See* Dkt. No. 195-1 at 13; Dkt. No. 195-2 at 57–59.)  Earlier in this case, VDOC provided Dr. Haber's fee schedule in relation to its motion in limine to exclude Dr. Haber's testimony.  (*See* Dkt. No. 76-1 at 20.)  Flores has *not*, however, provided any sort of receipt or bill to substantiate the actual costs incurred for retaining Dr. Haber as an expert witness, nor any documentation of the costs VDOC has already paid to Flores for Dr. Haber's services, if any.  Additionally, as discussed in more detail *infra*, Flores has not provided an accounting of how many hours Dr. Haber spent on this case.  Therefore, the court will order Flores to supplement the record with invoices or receipts associated with Dr. Haber's expert testimony.

   b.  *Reasonableness of costs*

VDOC claims that Flores's costs for expert witnesses, videography, and real-time transcription are unreasonable.  Parties may seek costs for paying expert witnesses

"reasonable fee[s]." Fed. R. Civ. P. 26(b)(4)(E)(i).  "Ultimately, it is in the court's discretion

to set an amount [for an expert witness fee] that it deems reasonable." *Fleming v. United*

*States*, 205 F.R.D. 188, 189 (W.D. Va. 2000).  VDOC argues that the flat fees both Dr. Haber

and Dr. Munoz charged are unreasonable, describing the costs associated with Dr. Haber's

work as an expert witness in particular as "patently unreasonable." (Dkt. No. 195-2 at 58–9.)

In particular, VDOC argues that the high flat fees charged by both experts—Dr. Haber and

Ms. Munoz—are unreasonable.  Flores's list of disbursements shows that Dr. Haber charged

Flores a flat fee of $3500 for his deposition and another flat fee of $8,000 for his preparation

for trial and testimony.  Additionally, Dr. Munoz charged Flores a $5,000 flat fee for her trial

testimony.

Previously in this case, Judge Hoppe concluded that Dr. Haber's flat fee of $3500 for

his deposition was unreasonable.  (Dkt. No. 45 at 1.)  Judge Hoppe instead instructed VDOC

to "promptly pay Dr. Haber a reasonable fee based on a rate of $400 an hour for the time he

spends in the deposition and preparing for the deposition."  (*Id*.)  Federal Rule of Civil

Procedure 72 allows a party to serve and file objections to a magistrate judge's order on non-

dispositive motions within 14 days after being served with a copy.  Flores did not file any

timely objections to Judge Hoppe's order.  However, it is unclear from the record whether

VDOC actually followed Judge Hoppe's order and paid Dr. Haber for his deposition at his

hourly rate.  As part of any renewed motion setting forth more detail as the hours spent by

Dr. Haber, Flores should supplement the record with any payment history showing whether

VDOC already paid any portion of Dr. Haber's deposition fees.

Presumably because they charged flat fees, rather than billing at an hourly rate, Dr.

Haber did not provide an accounting of the hours he spent preparing for trial, and neither Dr.

Haber nor Dr. Munoz provided an hourly invoice for testifying at trial.  Without knowing the precise number of hours these two expert witnesses spent working on Flores's case, however, it is impossible for the court to accurately assess the reasonableness of Flores's expert witness costs.  Accordingly, the court will deny without prejudice Flores's request for costs insofar as she seeks expert witness fees, and will allow Flores to file a renewed motion supplemented by a detailed accounting of the time Dr. Haber and Dr. Munoz spent on her case before assessing the reasonableness of her expert witness costs.

Although the court is declining to assess the reasonableness of Flores's expert witness costs at this time, the court will address VDOC's argument that Flores should not be awarded costs related to Dr. Munoz's work as an expert witness because Dr. Munoz directed Flores to pay a "third party" non-profit organization.  (Dkt. No. 197 at 8–9.)  VDOC states, "'Costs' do not include a law firm's donation to a non-profit organization," yet fails to provide any authority to support this assertion.  (*Id.* at 9.)  The Fourth Circuit has stated that parties are entitled to *attorneys' fees* even if "the attorney has agreed to contribute the money, in whole or in part, to a civil rights organization."  *Tillman v. Wheaton-Haven Recreation Ass'n*, 517 F.2d 1141, 1148 (4th Cir. 1975).  The court finds that the same principle should apply when it comes to expert costs that are donated to charities and other public interest organizations.  Therefore, if the court *does* ultimately award expert costs, the fact that Dr. Munoz instructed Flores to donate her costs to a non-profit organization will not in any way diminish Flores's award of costs.

VDOC also argues that Flores's videography costs are unreasonable since videography for the depositions was unnecessary.  (Dkt. No. 197 at 9.)  Flores explains that each deposition was conducted remotely because they took place before full vaccination

against COVID-19 was common, thereby necessitating the use of remote video technology in order to reduce the risk of COVID-19 transmission.  (Dkt. No. 201 at 6.)  VDOC argues that the videography costs were not "necessarily obtained for use in the case," and that such fees are only necessary when "the witnesses are beyond the court's subpoena power and there is no assurance that the witnesses will attend the trial."  (Dkt. No. 197 at 9 (citing *Supinger v. Virginia*, No. 6:15cv17, 2019 WL 1450530 at *37-38 (W.D. Va. Mar. 4, 2019)).)  Defendant, however, cites a case from 2019, a year prior to the COVID-19 pandemic.  The use of videoconferencing software has become a fact of life since the outbreak of COVID-19, including within the judiciary.  Indeed, *VDOC's attorneys themselves* used videoconferencing software to conduct their own depositions remotely.  (Dkt. No. 201 at 6.)  The court concludes that the use of videoconferencing technology for Flores's depositions was clearly necessary to protect the health and safety of all parties and witnesses.  The court orders VDOC to pay the costs associated with videography for Flores's depositions, in the amount of $3,965.70.

Finally, VDOC claims that Flores's real-time transcription costs, in the amount of $2,440, are "not recoverable."  (Dkt. No. 197 at 9.)  In *Sines v. Kessler*, the court allowed a party to collect costs for real-time transcription.  No. 3:17-CV-00072, 2023 WL 2388050, at *18 (W.D. Va. Mar. 7, 2023).  However, *Sines* was a particularly unusual and complex case, unlike the immediate case.  The court does not doubt that Flores's counsel found the transcripts helpful, but Flores's request for real-time transcription costs is denied.

For the reasons set forth above, Flores is entitled to $13,079.52 in miscellaneous undisputed costs and $3,965.70 in videography costs.  If Flores still seeks recovery of her expert witness fees, she should file a renewed motion with additional information sufficient

to allow the court to assess the reasonableness of their costs.

### 4. Analysis—Rule 68 offer of judgment

Rule 68 provides that a defendant may, at least 14 days before trial, "serve on an opposing party an offer to allow judgment on specified terms, with the costs then accrued." *See Said v. Va. Commonwealth Univ./Med. Coll. of Va*., 130 F.R.D. 60, 63 (E.D. Va. 1990). If the offeree does not accept and "the judgment that the offeree finally obtains is not more favorable than the unaccepted offer, the offeree must pay the costs incurred after the offer was made." *Id.* That includes the costs of both the offeree and offeror. *See id.*

On April 29, 2022, VDOC made a Rule 68 offer of judgment to Flores in the amount of $85,000. That offer represented "full and complete satisfaction of [Flores's] claims against [VDOC]" and included attorneys' fees, costs, and any interest incurred as of that date. (*See* Dkt. No. 197 at 10.) Flores rejected the offer. At the conclusion of trial, the jury returned a verdict for Flores in the amount of $85,000 (ironically, the exact amount of the offer of judgment)—although *exclusive* of attorneys' fees, costs, and back pay.

Now, VDOC argues that "[a]ssuming *arguendo* that the verdict stands *and that Flores does not receive any backpay award* . . . , Flores's rejection of the Rule 68 offer of judgment should operate to foreclose any fees and costs incurred after April 29, 2022." (*Id.* at 10 (emphasis added).) However, because the jury verdict and the Rule 68 offer of judgment were both exactly $85,000, if the court were to award even $1 of back pay to Flores, the final judgment would be, by definition, "more favorable" than the unaccepted offer. Here, as discussed earlier, the court will award much more than $1 in back pay. Thus, VDOC's argument as to the Rule 68 offer of judgment is no longer relevant.

III.  CONCLUSION

For the foregoing reasons, VDOC's motion for judgment as a matter of law (Dkt. No. 198) will be denied, and Flores's motions for an award of back-pay damages (Dkt. No. 194) and for attorneys' fees (Dkt. No. 192) will be granted in part and denied in part.  Flores's motion for costs (Dkt. No. 192) will be granted in part and denied without prejudice in part. The court will award $93,808 in back pay with a 6% per annum prejudgment interest accruing from July 31, 2019, $147,842.50 in attorneys' fees, and $17,045.22 in costs.  Flores may file a renewed motion for costs only as to her expert witnesses no later than 14 days after the entry of the order.

An appropriate order will follow.

Entered: September 27, 2023.


*/s/ Elizabeth K. Dillon*
Elizabeth K. Dillon
United States District Judge